## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRIAN BARRY, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>HOWARD W. LUTNICK, LEE AMAITIS, CANTOR FITZGERALD SECURITIES, CANTOR FITZGERALD L.P., CF GROUP MANAGEMENT, INC. and ESPEED, INC.,<br><br>Defendants. | No.05CV2310 (SAS)<br>"ECF CASE"<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br>**<u>JURY TRIAL DEMANDED</u>** |

### <u>NATURE OF THE ACTION</u>

1.     This is a federal class action on behalf of persons who purchased or otherwise acquired securities of eSpeed, Inc. ("eSpeed" or the "Company") between August 12, 2003 and July 1, 2004, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     During the Class Period, defendants touted eSpeed as an unmitigated success story, a company which had achieved record revenues and earnings and, most importantly, a company that had established its infrastructure and business model as an unqualified success in the high-volume, automated trading of government securities and foreign exchange.

3.     In several press releases, defendants represented that the eSpeed business model was in place and performing as anticipated. The true facts, which defendants knew or recklessly disregarded, were that the business model was not working and eSpeed was losing market share to its principal competitor, ICAP Plc ("ICAP"), and its BrokerTec division.

4.     The fact that eSpeed did not have a viable business model was revealed on July 1, 2004, when defendants were forced to admit that the Company's revenue, earnings and market share were decreasing, that its business plan was not working, that it was being forced to develop a new business plan and pricing structure, and its competitive efforts with respect to ICAP were not successful.

5.     In the two trading days following the announcement, eSpeed shares dropped more than $6.00 per share, on trading volume of more than nine million shares, a loss in market value for the Company of almost $350 million. As a result of defendants' false and materially misleading positive statements made during the Class Period, Class members purchased eSpeed shares at artificially inflated prices and were damaged thereby.

## JURISDICTION AND VENUE

6.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

7.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

8.     Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District, and the corporate defendants reside in this District.

9.     In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

10.     Plaintiff Brian Barry as set forth in the accompanying certification, incorporated by reference herein, purchased eSpeed securities at artificially inflated prices during the Class Period and has been damaged thereby.

11.     Defendant eSpeed, Inc. develops and deploys interactive vertical electronic marketplaces and related trading technology that offers traders access to liquid, efficient and neutral financial markets.  As of September 3, 2004, eSpeed had 32,484,164 shares of Class A common stock and 23,889,270 shares of Class B common stock outstanding. The eSpeed Class A common shares trade on the NASDAQ National Market System; the Class B shares do not trade. Class A shares have one vote per share; Class B shares have ten votes per share. The Company's World Headquarters are situated at 135 East 57th Street, New York, New York 10022. eSpeed is a subsidiary of Cantor Fitzgerald.

12.     Defendant Howard W. Lutnick is the Company's Chairman and Chief Executive Officer and principal spokesman. Defendant Lutnick joined Cantor Fitzgerald, L.P. (which directly and indirectly controls eSpeed, as described below) in 1983 and has served as President and CEO of Cantor Fitzgerald, L.P. since 1992. Defendant Lutnick's company, CF Group Management Inc., is the managing general partner of Cantor Fitzgerald, L.P.

13.     Defendant Lee Amaitis is the Vice Chairman, Global Chief Operating Officer and a director of eSpeed. Defendant Amaitis has been Executive Managing Director of eSpeed

International Limited since December 1999, and has been President and CEO of Cantor Fitzgerald International and Cantor Fitzgerald Europe since March 1995.

14.     Defendant Cantor Fitzgerald Securities ("CFS") is a broker-dealer registered with the Securities and Exchange Commission and a member of the National Association of Securities Dealers. CFS is the controlling shareholder of eSpeed by virtue of its ownership of 21.2 million eSpeed Class B shares. CFS has the power to direct the actions of eSpeed and to elect its Board.

15.     Defendant Cantor Fitzgerald, L.P. ("CFLP") is the managing partner of CFS. CFLP has the power to direct the actions of CFS, and therefore those of eSpeed.

16.     Defendant CF Group Management, Inc. ("CF Group") is the managing partner of CFLP, and has the power to direct the actions of CFLP, CFS and those of eSpeed. Defendant CF Group's President and sole shareholder is Defendant Lutnick.

17.     During the Class Period, Defendants Lutnick and Amaitis, as senior executive officers and/or directors of eSpeed, and defendants CFS, CFLP and CF Group were privy to non-public information concerning eSpeed's business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, Defendants Lutnick and Amaitis knew or recklessly disregarded that adverse facts specified herein had not been disclosed to, and were being misrepresented to, the investing public.

18.     As officers and controlling persons of a publicly held company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and which were publicly traded and governed by the provisions of the federal securities laws, Defendants Lutnick and Amaitis each had a duty to promptly disseminate, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.  Defendant Lutnick's and Amaitis' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the securities of eSpeed between August 12, 2003 and July 1, 2004, inclusive (the "Class Period") and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

20.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, eSpeed securities were actively publicly traded. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of

members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by eSpeed or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

21.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

22.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

23.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        (a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

        (b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of eSpeed; and

        (c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

24.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

25.     eSpeed, Inc. develops and deploys interactive vertical electronic marketplaces and related trading technology that offer traders access to liquid, efficient and neutral financial markets. eSpeed operates multiple-buyer, multiple-seller, real-time electronic marketplaces for the global capital markets, including government bond markets and other fixed income and equities marketplaces. The Company's suite of marketplace tools provides end-to-end transaction solutions for the purchase and sale of financial and non-financial products over its global private network or via the Internet. The Company has organized its business in four categories across multiple liquid and commoditized industries in the financial services markets. These four categories are: (1) core products, (2) product extensions and enhancements, (3) eSpeed Software Solutions sales and (4) new product rollouts. eSpeed is a subsidiary of Cantor Fitzgerald.

### Materially False And Misleading Statements Issued During The Class Period

26.     The Class Period commences on August 12, 2003. On that day, eSpeed issued a press release announcing the Company's second quarter 2003 financial performance. The press release stated in part:

> eSpeed Reports Second Quarter 2003 Fully Taxed Operating EPS of $0.15 and
> GAAP EPS of $0.14

Pre-Tax Operating Earnings Per Share of $0.25 Increases 92 Percent and
Revenues Grow 28 Percent Year Over Year

Net Operating Margins Expand to Over 35 Percent

Company Significantly Improves Outlook for Full Year 2003

27.     The August 12, 2003, press stated that for the second quarter ended June 30,

2003, the Company reported revenue of $39.1 million, and fully electronic revenues of $27.5

million. The Company reported earnings of $8.3 million or $0.15 per share. Fully electronic

volume was $7.8  trillion.

28.     The August 12 press release quoted Defendant Lutnick as stating :

Our year-over-year pre-tax operating earnings per share growth of 92 percent
demonstrates the success of our business model. Just over a year ago we
established our growth strategy, and we are delivering on that commitment to
shareholders. We are consistently improving our profitability, this quarter
delivering 35.5 percent operating margins, compared to the 29.6 percent reported
last quarter, and the 24.1 percent reported a year ago.

29.     Defendant Amaitis was quoted as stating:

The record US budget deficit and corresponding debt issuance have improved the
market in which eSpeed operates. We believe that the increased US Treasury
issuance, which began in the middle of the second quarter, is indicative of the
expanded US Treasury market that is at the heart of eSpeed's core business. As
the leader in US Treasuries, eSpeed is uniquely positioned to benefit from the
tremendous opportunities created by this volume and issuance growth.

30.     The August 12 press release further touted eSpeed's performance, as follows:

The Company is raising its guidance for full year 2003 net operating earnings to a
range of $0.64 - $0.67 per share diluted and after-tax from $0.54 per share diluted
and after-tax. eSpeed's improved guidance is predicated on the Company's
expectation that average daily Federal Reserve US Treasury volume for the full
year 2003 will be between $430 - $440 billion per day, up from the previous
expectation of between $400 - $408 billion per day. The Company's guidance is
based on its expectation that average daily Federal Reserve US Treasury volume
will be between $440 - $460 billion per day in the third and fourth quarters of
2003. eSpeed expects to generate pre-tax operating margins in excess of 36

percent and incremental margins to continue to exceed 60 percent for the second half of 2003. For the third quarter 2003, the Company expects to earn in the range of $0.16 - $0.17 per share diluted and after-tax.

31.     Defendant Lutnick was further quoted, stating as follows:

The tremendous growth in the US Treasury market and the success of our price improvement (PI) software in the second quarter resulted in a 15 percent sequential increase in both eSpeed's revenues and fully-electronic volume. Our increased guidance for the third quarter is based on our expectation that we will improve our market position by outperforming the Federal Reserve US Treasury volumes and by realizing continued traction in our price improvement business, and we have already seen these improvements during the month of July. We believe our unique leadership position, at an unprecedented time of record issuance in the US Treasury markets, coupled with our ability to leverage our technology enhancements, leave us extremely well-positioned for growth throughout the remainder of 2003 and beyond.

32.     On August 23, 2004, the price of eSpeed stock rose from $19.95 to $22.15, on

volume of more than two million shares.

33.     On November 12, 2003, eSpeed issued a press release announcing  the

Company's third quarter 2003 performance, stating in part :

eSpeed Reports Record Third Quarter 2003 Fully Taxed Operating EPS of $0.19 and GAAP EPS of $0.17

Pre-Tax Operating Earnings Per Share of $0.31 Increase 94 Percent and Quarterly Revenues Grow 34 Percent to $44 Million Year Over Year

Pre-Tax Operating Margins Expand to 40 Percent

Company Expects Strong Results for Full Year 2004, Guiding Fully Taxed Operating EPS of $0.80-0.84

34.     In the November 12, 2003, press release, the Company reported revenue of $44.3

million for the quarter ended September 30, 2003.  Fully electronic revenues increased to $32.3

million.  The Company reported fully taxed operating income of $10.8 million or $0.19 per

share. Fully electronic volume was $9.6 trillion. The press release quoted defendant Lutnick,

stating in part as follows:

> Our strong results this quarter were primarily based on our unmatched position as the leading electronic platform in the US Treasury market. eSpeed's market position dramatically improved as evidenced by both our volume growth outpacing that of the Federal Reserve US Treasury average daily volumes as well as the success and continued traction of our Price Improvement (PI) product enhancement. During the third quarter, we saw increases in both the number of PI users as well as the number of transactions executed using Price Improvement.

35.     Defendant Amaitis was quoted as stating:

> Our foreign exchange product has received excellent customer feedback, and we believe it has the potential to transform the foreign exchange market by increasing efficiency and broadening market participation. We remain on target with the roll-outs of both our mortgage backed securities and interest rate swaps products which will be on traders' desktops by the end of the year.

36.     The November 12, 2003 press release as stated the following, with respect to the

Company's 2003 financial guidance :

> The Company maintains its full year 2003 operating income guidance in a range of $0.65 - $0.67 per share diluted and after-tax, which includes actual third quarter results and guidance for the fourth quarter. Full year 2003 guidance is predicated on the expectation that average daily Federal Reserve US Treasury volume will be between $436 and $439 billion.

> For the full year 2004, eSpeed expects to generate revenue in excess of $185 million and expects its pre-tax operating margins to exceed 41 percent for the full year. eSpeed anticipates that its incremental margins will exceed 75 percent for the full year 2004. Operating earnings for 2004 are expected to be in a range of $0.80 and $0.84 per share diluted and after-tax. This guidance is based on the Company's expectations that average daily Federal Reserve US Treasury volume will be between $490 and $510 billion for the full year 2004.

37.     Defendant Lutnick was further quoted, stating as follows:

> With impressive results so far in 2003, we are well positioned to continue our growth in 2004. We expect 2004 will be characterized by continued US Treasury market issuance with additional US Treasury benchmark issues being added, further traction in our Price Improvement and Contingent Order product

enhancements as well as new applications for each of these product enhancements, and a reasonable expectation of traction in our Foreign Exchange, Equities and other new products. We look forward to extending our solid leadership position into 2004 and beyond.

38.     The Company also reported that it expected daily U.S. Treasury volume to decrease in fourth quarter 2003, that there would be a "seasonal slowdown" due to the Thanksgiving and Christmas holidays, and thus fewer trading days and lower operating income. However, this was attributed to normal seasonal variation and not to the Company's fundamental business problems, which were not disclosed by defendants:

> For the fourth quarter 2003, eSpeed expects average daily Federal Reserve US Treasury volume to be between $425 and $435 billion, down from the previously expected $440 - $460 billion. The Company anticipates that the seasonally slower fourth quarter, specifically due to the Thanksgiving, Christmas and New Year's holidays and two fewer trading days, will result in comparatively lower average daily volumes. For the fourth quarter 2003, the Company expects to generate operating income in the range of $0.14 - $0.15 per share diluted and after-tax.

39.     On February  9, 2004, an eSpeed press release announced the Company's fourth quarter 2003 results, and reiterated its 2004 guidance, stating in part as follows:

> eSpeed Reports Fourth Quarter 2003 GAAP and Fully Taxed Operating EPS of $0.15
>
> Fourth Quarter Pre-Tax Operating Earnings Per Share of $0.25 Increase 56 Percent and Quarterly Revenues Grow 20 Percent to $39 Million Year Over Year
>
> Company Reiterates Strong Guidance for Full Year 2004

40.     In the February 9, 2004 press release, the Company reported revenue of $39.2 million Fully electronic revenues were $27.7  million. The Company reported fully electronic volume of $7.5  trillion for fourth quarter 2003 and net income of $8.6 million, or $0.15 per diluted share. The press release further stated as follows:

The Company is maintaining its previously stated guidance for the full year 2004. eSpeed continues to expect to generate revenues in excess of $185 million and expects its pre-tax operating margins to exceed 41 percent for the full year 2004. eSpeed anticipates that its incremental margins will exceed 75 percent for the full year 2004. Operating earnings after tax for 2004 are expected to be in a range of $0.80 to $0.84 per diluted share. This guidance is based on the Company's expectations that average daily Federal Reserve US Treasury volume will be between $490 and $510 billion for the full year 2004.

For the first quarter 2004, eSpeed expects operating earnings to be in the range of $0.18 and $0.20 per share diluted and after-tax. This guidance is based on the Company's expectations that the average daily Federal Reserve US Treasury volume will be between $480 and $500 billion for the first quarter 2004.

41.     The press release quoted defendant Lutnick, stating as follows

For eSpeed, 2004 will be characterized by the increasing growth in the US Treasury market overall and eSpeed's leadership position in this market, the continued introduction and adoption of enhancements to our software and the initial roll out of new products to be traded and leveraged across the eSpeed platform. We are encouraged by the strong foundation we have built, as we position ourselves for further growth in the future.

42.     On May 3, 2004, eSpeed issued a press release announcing the Company's first quarter 2004 results, stating in part as follows:

eSpeed Reports Strong First Quarter 2004 Fully Taxed Operating EPS of $0.19 and GAAP EPS of $0.18

First Quarter Pre-Tax Operating Earnings Per Share of $0.31 Increase 72 Percent and Quarterly Revenues Grow 31 Percent Year Over Year to $44.6 Million

Company Reiterates Guidance for Full Year 2004

43.     The May 3, 2004, press release reported revenue of $44.6 million for the quarter ended March 31, 2004. Fully electronic revenue was $30.5 million, and fully electronic volume for the quarter was $8.3 trillion. Earnings reported were $10.7 million, or $0.18 per share. The press release quoted defendant Lutnick as follows:

We are proud to have reported strong top and bottom line results this quarter. Our pre-tax operating margin of over 40 percent for the first quarter clearly demonstrates the strength and leverage of our business model.

44.     The May 3 press release quoted Defendant Amaitis as follows:

The continued success of our Price Improvement product enhancement was illustrated in the solid growth we saw this quarter in both revenues and volumes. We will continue to add value to our clients' execution capabilities with the introduction this quarter of our product enhancement Better Fill. We are excited to be able to offer additional proprietary trading tools that can improve the quality of our customers' trade executions and their profitability.

* * *

We are aggressively launching new products including repos, and while we are in the early stages of these initiatives, we are pleased to offer increased transparency into our new product volumes. As expected, no single new product has yet reached traction, but we are encouraged by our results over the last two quarters.

45.     The May 3, 2004, press release also stated the following, with respect to the

Company's 2004  financial guidance:

The Company is maintaining its previously stated guidance for the full year 2004. eSpeed continues to expect to generate revenues in excess of $185 million and expects its pre-tax operating margins to exceed 41 percent for the full year 2004. eSpeed anticipates that its incremental margins will exceed 75 percent for the full year 2004. Operating earnings after tax for 2004 are expected to be in a range of $0.80 to $0.84 per diluted share. This guidance is based on the Company's expectations that average daily Federal Reserve US Treasury volume will be between $490 and $510 billion for the full year 2004.

For the second quarter 2004, eSpeed expects operating earnings to be in the range of $0.19 to $0.20 per share diluted and after-tax. This guidance is based on the Company's expectations that the average daily Federal Reserve US Treasury volume will be between $490 and $510 billion for the second quarter 2004.

46.     Defendant Lutnick was further quoted in the May 3 press release as follows:

As we look ahead for the rest of 2004, we remain confident in eSpeed's leadership position in US Treasuries, continue to have high expectations about the increased acceptance of our product enhancements, and are committed to successfully rolling out new products. To further ensure our success, we have strengthened our management team with the additions of KEVIN Foley, our new

-13-

President, and Paul Saltzman, our new Chief Operating Officer. With KEVIN's extensive career that has been focused largely on the convergence of financial products and trading technology, along with his expertise in foreign exchange and equities, and Paul's relationships and experience in the fixed income markets, they are uniquely qualified to make a significant contribution toward our growth in new products and in our company

47.     On May 4, 2004, eSpeed shares closed at $18.22, up from the previous day's close of $17.43, on volume of 634,000 shares

48.     Also on May 4, 2004, defendants held an Analysts Conference during which defendant Amaitis referred to ICAP's acquisition of BrokerTec, and the agreement by which BrokerTec capped commissions, stating:

> The end of this quarter saw our market position decline slightly. We believe that decline *was due to the one-time acquisition related volume incentives paid to the owners of our competitor.* From what we understand these volume incentives ended in May of 2004 around the one year anniversary of the acquisition. Once this short term effect has passed we expect our market position to improve.

[Emphasis added.]

49.     Defendant Lutnick reaffirmed second quarter guidance of operating earnings of $0.19 to $0.20 per share. The Company also emphasized that its proprietary trading products would cause trading volumes to increase:

> Now, let's update our product enhancements and some of our new product initiatives. Price improvement usage continued to grow in the first quarter. We estimate that more than 20 percent of our trades contained some degree PI in the first quarter '04 and now over 30 percent of our users are using price improvement regularly. Better Fill, which is our trading through the stack functionality facilitates execution at multiple prices while respecting the exclusive time of current traders. It allows for execution against limit orders in the book behind the best bid and offer without waiting for a current trade to clear. Geared toward program and high volume traders Better Fill offers enhanced trading execution, increased efficiency and better trading opportunities to our customers. We are rolling out Better Fill to our customers this week and we will continue to roll out over the balance of the second quarter. As with PI we expect trading volumes to increase as more and more customers become comfortable with the

-14-

new software and begin to rely on this proprietary trading tool. As adoption of this innovative product catches on we expect eSpeed's profitability and market position to grow. In the often run and when issued, the advent of Better Fill enhances our contingent order software. We now have a superior set of technological tools in place to build liquidity, in the often run and when issued markets. On the new product front, we rolled out Treasury repo's in early April. Repo's are  repurchased agreements which refer to the borrowing and lending of treasury securities. The eSpeed system offers an anonymous platform for lenders and borrowers to find one another. Gather regarding repo's will be reported with our new product volume in our second quarter results.

50.     On May 10, 2004, the Company issued a press release announcing the interim appointment of Jay Ryan as Chief Financial Officer, replacing Jeffrey Chertoff who was resigning to "pursue other opportunities."  The press release stated, in pertinent part, as follows:

eSpeed has experienced tremendous growth since its inception, and we believe our future growth into new products and services is best served with a CFO who is exclusively responsible for the Company's financial operations. We are fortunate to have an experienced and accomplished financial manager of Jay Ryan's caliber join our executive team in the interim," said Chairman and CEO Howard W. Lutnick. He added, "We'd like to sincerely thank Jeff for his work and contributions over the past two years, and wish him the best in his future endeavors.

51.     On May 11, 2004, eSpeed shares closed at $18.75, up from the previous day's close of $17.58 on May 10, 2004, on volume of 584,000 shares.

52.     Defendants' statements described in ¶¶ 26-50 were materially false and misleading when made because contrary to their representations, defendants knew or recklessly disregarded that (i) eSpeed was not successfully competing with ICAP; (ii) eSpeed's market share was declining; (iii) ICAP was taking market share from eSpeed; and (iv) eSpeed's pricing model was driving customers to its principal competitor.  Moreover, defendants' claims that eSpeed's pricing model was successful was materially false and misleading, because the true fact was that eSpeed's pricing model did not operate to drive customers to eSpeed but, rather, to its

competitor. eSpeed was eventually forced to scrap its pricing structure and abandon the Price Improvement ("PI") feature.

**Disclosures at the End of the Class Period**

53.     On July 1, 2004, the Company issued a press release acknowledging eSpeed's business was not progressing as previously represented. In the press release, characterized as an "update" of financial expectations for the second quarter ended June 30, 2004, the Company announced that it expected to report net income in the range of $0.15 to $0.16 per share for second quarter 2004, and revenue in the range of $42-$43 million. Fully electronic revenue was expected to be in the range of $28-$29 million, and fully electronic volume was expected to be $8 trillion. Defendant Lutnick was quoted, in part as follows:

> Our weaker than expected performance during the second quarter was due to erosion of our market position from competitive pricing pressure and lower than expected market volumes in Europe. We are proactively addressing our market position, by offering tailored and flexible solutions that have the effect of driving down the marginal costs of trading on eSpeed. We are focusing on a revenue growth strategy that offers our customers the combination of variable and fixed commissions and value-added trading tools.

54.     The market reacted swiftly to eSpeed's about face. On July 1, 2004, the next trading day, the share price dropped 25 percent, from $17.46 to $13.01, on volume of more than six million shares.  The drop continued on July 3, as shares fell to $11.39 on volume of 2.8 million shares.

**Post-Class Period Disclosures**

55.     During an Analyst's Conference on July 2, 2004, defendant Lutnick represented that the downturn in the Company's revenues and earnings for second quarter 2004 were principally attributable to a special deal ICAP had with customers, which capped those

-16-

customers' costs at a fairly low trading level, and then allowed them to trade for free. As a result,

ICAP took trading volume from eSpeed. Defendant Lutnick reiterated that this special deal with

ICAP had expired,  and therefore would not affect eSpeed in the future:

> With respect to our market share, as we mentioned on our last conference call,
> during the second quarter, we were impacted by one-time acquisition related
> volume incentives paid to the former owners of our competitor. These incentives
> had a greater impact than we anticipated in May and although our market share
> improved in June, we were still below our expectation. Also during the second
> quarter, we saw lower-than-expected market volumes in Europe. This market
> softness impacted our voice revenue and associated volumes and  earnings.

56.     In the aftermath of the July 2, 2004,  Analysts Conference, an article published by

*CBS MarketWatch* reported that analysts were unconvinced that eSpeed's explanations made

sense, or that ICAP's market share advantage had ended:

> **Price, market share woes at eSpeed**
> *By Greg Morcroft, CBS.MarketWatch.com*
>
> If eSpeed is to fight off rivals in electronic bond trading, Chairman and Chief
> Executive Howard Lutnick must find a way to grow the company's market share
> without trimming profits, analysts said Friday.
>
> "At this point, it's a problem in search of a solution," according to Jeffries and
> Co. analyst Charlotte Chamberlain.
>
> The company, a pioneer in electronic bond trading, warned Thursday that it's
> losing market share at an alarming rate amid a price war with competitor ICAP
> BrokerTec.
>
> What's more, Lutnick's attempt to calm investors' distress appeared to fall on deaf
> ears, as eSpeed  shares slipped more than 25 percent Friday.
>
> "With respect to our market share, as we mentioned on our last conference call,
> during the second quarter we were impacted by one-time acquisition-related
> volume incentives paid to the former owners of our competitor," the chief
> executive said in a statement Thursday. "These incentives had a greater impact
> than we anticipated in May, and although our market share improved in June, we
> were still below our expectation."

ICAP acquired BrokerTec in May 2003, and at that time the banks that sold it agreed to generate at least $61.3 million a year in commissions for the merged company, while in return their commissions were capped at $97.5 million for up to three years.

Lutnick, who is also chairman and chief executive of Cantor Fitzgerald, frustrated some analysts in a conference call Friday, saying he failed to lay out a feasible plan to aggressively compete with ICAP on pricing and product offerings.

He declined to give any estimates for Treasury bond issuance next year -- despite the fact that Cantor has an extensive research department dedicated in large part to estimating new issuance, the bread and butter of the two businesses.

"[Lutnick] had nothing to say about that, that's just not credible. The problem is these are things that he should have at the tips of his fingers: 'What is your research department saying about issuance?'" Chamberlain said.

"Some of the frustration might have been just due to a lack of information on some of the details," Merrill Lynch's Colin Clark added.

**Lower market share, issues in Europe**

The trading technology firm lowered its second-quarter profit forecast due to lost market share and lower than expected European trading volumes. []

"Our weaker than expected performance during the second quarter was due to erosion of [eSpeed's] market position from competitive pricing pressure and lower than expected market volumes in Europe," Lutnick asserted.

The profit warning came despite the fact that bond trading volumes during the quarter were strengthening, and even with some analysts expecting a drop in market share, they expected the growing market to justify earnings expectations.

"The challenge to the company's market share in recent quarters was cause for concern, but we believed this was only minor if [eSpeed] was able to maintain a smaller piece of a growing market with innovative and higher-margin products," Keefe Bruyette and Woods analysts wrote in a research report Friday.


**But apparently that's not what's happening:**

Analysts indicate eSpeed is losing market share and income because of ICAP's

-18-

commission limits. As bond trading volume rose in the quarter, those fee caps kicked in earlier in each of the three months in the quarter, driving business to ICAP.

Also, eSpeed has initiated new fees in the last year to pay for added value for customers, but it's far from clear these are as attractive as the company expected. ICAP's pricing, with its fee caps, may be attracting high volume customers, while eSpeed's new charges may be hurting the company's volumes.

"The magnitude of the market share deterioration was more than expected. There's been more clarity surrounding the issue of fee caps, and [on] the need to address that issue and possibly adopt similar pricing structures," Merrill's Clark said.

**Structural concerns**

Dealing primarily in benchmark government bonds sold constantly by the U.S. Treasury to fund deficits, eSpeed offers electronic trading in those securities, but does not offer trading in so-called off-the-run and when-issued securities

"That's where they're losing market share, because they don't have a viable product in this ancillary market," Jeffries' Chamberlain noted.

Analysts had been expecting record U.S. deficits, and the government's need to fund them by issuing Treasurys would help eSpeed maintain profit growth, even amid a shrinking market share.

"However, given the erosion of its core product segment, our previous thesis -- that 2004 earnings per share will be driven by a large deficit and therefore record U.S. Treasury volumes -- has unwound as eSpeed could not maintain its market share and take advantage of this favorable environment," Sandler O'Neill analyst Rich Repetto said Friday.

57.     On August 5, 2004, eSpeed reported disappointing revenue and earnings for the second quarter of 2004. The Company reported revenue of $42.8 million. Second quarter 2004 fully electronic revenues were $29.2 million. The Company also reported net income of $9.0 million, or $0.16 per share, and fully electronic volume of $8.0 trillion.

58.     On August 6, 2004, the Company held an Analysts Conference. The Company admitted that it was revamping its pricing structure to a mostly fixed pricing model, from the

prior structure consisting of a low fixed price component and a higher variable pricing component.  Additionally, the Company advised that it would custom tailor its pricing to each customer. Also, the Company stated that it would hire more experienced sales personnel with a greater component of fixed compensation and, as a result, that marketing costs would rise.

59.    On November 4, 2004, the Company reported its third quarter 2004 financial results. The Company reported revenues of $39.8 million and fully electronic revenue of $25.5 million, and earnings per share of $0.10. Fully electronic volume was reported at $6.9 trillion, down significantly from previous quarters.

60.    On January 4, 2005, the Company announced that it would remove the Price Improvement feature ("PI") from its system.  PI allowed traders to advance their positions by offering a slightly higher bid or asked.  Previously, PI had been touted as one of the features which made eSpeed better than its competitors. The Company's share price has not recovered; eSpeed shares currently trade at approximately $10 per share.

## UNDISCLOSED ADVERSE FACTS

61.    The market for eSpeed securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, eSpeed securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired eSpeed securities relying upon the integrity of the market price of eSpeed securities and market information relating to eSpeed, and have been damaged thereby.

62.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of eSpeed securities, by publicly issuing false and misleading

statements and omitting to disclose material facts necessary to make defendants' statements, as

set forth herein, not false and misleading.  Said statements and omissions were materially false

and misleading in that they failed to disclose material adverse information and misrepresented

the truth about the Company, its business and operations, as alleged herein.

63.     At all relevant times, the material misrepresentations and omissions particularized

in this Complaint directly or proximately caused or were a substantial contributing cause of the

damages sustained by plaintiff and other members of the Class.  As described herein, during the

Class Period, defendants made or caused to be made a series of materially false or misleading

statements about eSpeed business, prospects and operations.  These material misstatements and

omissions had the cause and effect of creating in the market an unrealistically positive

assessment of eSpeed and its business, prospects and operations, thus causing the Company's

securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially

false and misleading statements during the Class Period resulted in plaintiff and other members

of the Class purchasing the Company's securities at artificially inflated prices, thus causing the

damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

64.     As alleged herein, defendants acted with scienter in that defendants knew that the

public documents and statements issued or disseminated in the name of the Company were

materially false and misleading; knew that such statements or documents would be issued or

disseminated to the investing public; and knowingly and substantially participated or acquiesced

in the issuance or dissemination of such statements or documents as primary violations of the

federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their

receipt of information reflecting the true facts regarding eSpeed, their control over, and/or

receipt and/or modification of eSpeed allegedly materially misleading misstatements and/or their

associations with the Company which made them privy to confidential proprietary information

concerning eSpeed, participated in the fraudulent scheme alleged herein.

65.     Defendants knew and/or recklessly disregarded the falsity and misleading nature

of the information which they caused to be disseminated to the investing public.  The ongoing

fraudulent scheme described in this complaint could not have been perpetrated over a substantial

period of time, as has occurred, without the knowledge and complicity of the personnel at the

highest level of the Company, including the Defendants named herein.

## FIRST CLAIM

**Violation Of Section 10(b) Of The Exchange Act
And Rule 10b-5Promulgated Thereunder
Against Defendants eSpeed, Lutnick and Amaitis**

66.     Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

67.     During the Class Period, defendants carried out a plan, scheme and course of

conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff

and other members of the Class to purchase eSpeed securities at artificially inflated prices.  In

furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them,

took the actions set forth herein.

68.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made

untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for eSpeed securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

69. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of eSpeed as specified herein.

70. These defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of eSpeed value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about eSpeed and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of eSpeed securities during the Class Period.

71. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's man-

agement team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

72.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing eSpeed operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

73.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of eSpeed securities

was artificially inflated during the Class Period.  In ignorance of the fact that market prices of eSpeed publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired eSpeed securities during the Class Period at artificially high prices and were damaged thereby.

74.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that eSpeed was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their eSpeed securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

75.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

76.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of The Exchange Act
### Against Defendants Lutnick, Amaitis, CFS, CFLP and CF Group

77.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

78.     The Individual Defendants acted as controlling persons of eSpeed within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

79.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

80.     As set forth above, eSpeed and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff

and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

1. Determining that this action is a proper class action, designating plaintiff as Lead plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

2. Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

3. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

4. Such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated: February 22, 2005

**MURRAY, FRANK & SAILER LLP**

_____/s/_____

Eric J. Belfi
Paul Curley (PC-8787)
275 Madison Avenue, Suite 801
New York, New York 10016
Telephone: (212) 682-1818
Facsimile: (212) 682-1892

**GLANCY, BINKOW & GOLDBERG
LLP**
Lionel Z. Glancy
Michael Goldberg
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Phone: (310) 201-9150
Fax: (310) 201-9160

**Attorneys for Plaintiff**